Kenneth A. Okazaki (USB #3844)
Nathan D. Thomas (USB #11965)
JONES WALDO HOLBROOK & McDONOUGH PC
170 South Main Street, Suite 1500
Salt Lake City, Utah  84101
Telephone:  (801) 521-3200

*Attorneys for Plaintiff KAM Financial, LLC*

---

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| KAM FINANCIAL, a Utah limited liability company<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SILVERLEAF FINANCIAL, a Utah limited liability company; ACM SILVERLEAF FUNDING, LLC, a Delaware limited Liability company, SHANE BALDWIN, an individual, CARY CLARK, and individual, ROSS BALDWIN, an individual, HESTON NIELSON, an individual, MATTHEW SMOOT, an individual, JOHN DOES 1-20, individuals, and ROE COMPANIES 1-20, form of entities unknown,<br><br>　　　　Defendant[s]. | **[~~PROPOSED~~] ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS, FINDINGS OF FACT & CONCLUSIONS OF LAW**<br><br><br>Case No. 2:12-cv-01111<br><br>Judge Clark Waddoups |

　　　　Upon consideration of Plaintiff's *Motion for Sanctions* (Docket No. 40 (the "Motion")), the court finding good cause appearing and  for the reasons set forth in the Motion pursuant to Federal Rules of Civil Procedure 37(d) and 37 (b)(2), Plaintiff's Motion is GRANTED.

　　　　The court ORDERS that the Answer of Defendants Shane Baldwin, Silverleaf Financial, LLC, and ACM Silverleaf Funding is hereby stricken and all matters set forth in the Complaint

are hereby deemed ADMITTED.  On the basis of this Order, the Court enters the following Findings of Fact & Conclusions of Law, and Judgment.

## FINDINGS OF FACT

The Court enters these findings of fact based upon the allegations of the Complaint on file in this matter which have been deemed admitted.

1.      Plaintiff KAM Financial, LLC, ("Plaintiff" or "KAM Financial") is a limited liability company, organized and existing under the laws of the State of Utah and with its principal place of business located in Utah County, Utah.

2.      Non-party Ken Murdock is the sole member and manager of KAM Financial.

3.      Defendant SilverLeaf Financial, LLC, ("SilverLeaf") is a limited liability company, organized and existing under the laws of the State of Utah.

4.      Defendant Shane Baldwin was a principal of SilverLeaf.

5.      ACM SilverLeaf Funding, LLC, is a Delaware limited liability company in which Defendant SilverLeaf possesses a membership interest ("SilverLeaf Funding").

6.      On its public website (www.silverleaf-financial.com), SilverLeaf has represented itself as a "private equity firm focused on acquiring performing and non-performing, 1st Deed of Trust whole loans secured by cash flowing commercial real estate."

7.      SilverLeaf has further represented that it "works close with the FDIC, banks, special servicers and other financial institutions to purchase assets for the purpose of future monetization."

2

8.      Notwithstanding the representations made on its website and otherwise, SilverLeaf operates primarily as a pass-through entity and a mere shell for the conduct of its principals' business opportunities.

9.      At the times relevant to this action, SilverLeaf's website contained a description of the general process employed by its business in purchasing distressed and defaulted loans from financial institutions.  According to this process, SilverLeaf accesses and analyzes the assets to be purchased to formulate the best possible plan for future monetization including the conduct of extensive underwriting due diligence for each prospective loan.

10.     SilverLeaf purported to acquire "loans through negotiation at discounted valued within" an "acceptable target range" and then "monetize" the acquired asset through "deal-specific exit strategies" which might include re-trading the loan, negotiation of forbearance, cooperation agreements, and/or deeds in lieu of foreclosure, or foreclosure.  SilverLeaf further states that it may hold and manage assets to maximize value at a future sale.

11.     At some time in 2010, SilverLeaf targeted Ken Murdock as a potential investor and commenced efforts to solicit funds from Murdock in a variety of projects.

12.     Murdock had previously participated in some SilverLeaf investment opportunities as part of a separate investment group, but never individually until after being first approached by Shane Baldwin in 2010.

13.     Early in his individual relationship with SilverLeaf, Murdock attended a lunch meeting with Shane Baldwin and Cary Clark, principals of SilverLeaf. At this lunch meeting, Shane Baldwin outlined a variety of potential investment opportunities for Murdock.

14.     One of the initial proposed investments discussed between Shane Baldwin and Murdock was participation in the purchase of certain distressed, but secured, loans that could be acquired by SilverLeaf.

15.     On or about June 16, 2010, SilverLeaf Funding, submitted a final bid through Mission Capital Advisors for assets owned by Marshall & Ilsley Bank  ("M & I Bank").  The assets which were the subject of SilverLeaf Funding's bid were various secured loans held by M & I Bank (the "M & I Assets").    The total proposed purchase price was $13,307,500.00.

16.     Among the M & I Assets was an asset described as "FL-5 BSP Oviedo" which was a loan secured by development property located in the State of Florida (the "Oviedo Asset"). SilverLeaf Funding attributed $3,520,033.00 of its bid amount to the Oviedo Asset.  On or about June 21, 2010, Shane Baldwin received an email confirming that SilverLeaf Funding's bid for the M & I Assets was accepted.

17.     On June 29, 2010, SilverLeaf Funding entered into a Loan Sale Agreement with M & I Bank for purchase of the M & I Assets for a total purchase price of $13,307,500.  This included a purchase price of $3,520,033 attributed to the Oviedo Asset.  The agreement required payment of a deposit in the amount of $1,330,750 by 2:00 p.m. on June 29, 2010. The remainder of the purchase price was to be paid on or before the closing date, defined as June 30, 2010 at 2:00 p.m.

18.     On June 29, 2010, SilverLeaf Funding also entered into a Loan Sale Agreement with M & I Bank for bank stock with a purchase price of $393,040.  The agreement required a deposit in the amount of $39,304.00 to be paid by June 29, 2010 at 2:00 p.m., with the remainder due at the time of closing – June 30, 2010 at 2:00 p.m.

4

19.     SilverLeaf Funding coordinated payment of the required deposits under the loan sale agreements on June 29, 2010. As of the acceptance of the SilverLeaf Funding bid for purchase of the M & I Assets and execution of the two loan sale agreements identified above, none of SilverLeaf, SilverLeaf Funding or Shane Baldwin possessed the funds necessary to close the contemplated purchase of the M & I Assets.

20.     Immediately after acceptance of the SilverLeaf Funding bid for the M & I Assets on June 21, 2010, Shane Baldwin sought investment funding from a variety of sources.  These efforts included the solicitation of funds from KAM Financial through Ken Murdock.

21.     On or about June 21, 2010, Shane Baldwin approached Ken Murdock, principal and manager of KAM, seeking investment as an equity partner in Oviedo in the Park, LLC ("Oviedo"). According to Shane Baldwin, Oviedo was to take ownership of the Oviedo Asset, but not the other M & I Assets.

22.     During their initial conversations on or about June 21 or 22, 2010, Shane Baldwin indicated to Murdock that SilverLeaf would be contributing $1,000,000.000 into Oviedo, but that SilverLeaf was seeking an additional $2,800,000.00 to close.  At that time, Shane Baldwin further represented that SilverLeaf had an offer to purchase either the Oviedo Asset or the property securing the same in 90 days for $12,000,000.00.

23.     On June 22, 2010, Shane Baldwin sent Ken Murdock an email containing the final bid award for the M&I Assets and on June 23, 2010, sent Murdock another email with a link to an article on the Oviedo Asset.

24.    Also on June 25, 2010, Shane Baldwin sent Murdock a detailed solicitation email which attached an asset summary. This email was apparently sent to multiple investor prospects although their identities are not apparent from the correspondence.

25.    The email solicitation sent on July 25, 2010, included several asset summaries and other information concerning a number of the M & I Assets and the underlying security therefore.  Murdock, however, had only been approached with respect to investment in the Oviedo Asset and not the other assets described in this email.

26.    In the June 25, 2010 email, Shane Baldwin represented that the SilverLeaf Funding bid for the M & I Assets included a purchase price for the Oviedo Asset of $3,872,036.30.  This same email indicates that there was an unpaid principal balance on loan comprising the Oviedo Asset of $20,520,000 and that foreclosure of the underlying real property was scheduled for July 29, 2010.

27.    With respect to the Oviedo Asset, Shane Baldwin identified three potential exit strategies in his June 25, 2010 email:

   a.    Sell the note to the original investment group to allow them to protect equity in their original investment;

   b.    Sell the note to an unidentified party which had offered to purchase the Oviedo Asset for $10 Million; or

   c.    Complete the foreclosure and "sell the property to American Land Corp for $13M to $15M."

In identifying these exit strategies, Shane Baldwin wrote that in late 2009 there was an offer submitted for the Oviedo Asset or the property securing the same in the amount of $22.5 Million.

6

1180695.1

28.     As of June 29, 2011, SilverLeaf Funding  had still not acquired the total amount of funds necessary to close the purchase of the M & I Assets on June 30, 20110.

29.     On June 30, 2010, Shane Baldwin wrote to M & I Bank indicating that SilverLeaf Funding was working to wire the closing funds but that SilverLeaf had missed the wire cut off.

30.     On July 1, 2010, Shane Baldwin wrote to Dan Will and Michael Kelly of Kelly Capital stating: "I have got to figure this out ASAP or I am going to lose this deal and my deposit."

31.     On that same day, M & I Bank delivered proposed amendments to the loan sale agreements to Shane Baldwin.  By these amendments, the time for performance by SilverLeaf would be extended, but increased the total purchase price due and owing to M & I Bank by $1,000,000.00.

32.     The proposed amendments allowed SilverLeaf and Shane Baldwin additional time to seek funding from third-parties to fund the purchase of the M & I Assets by SilverLeaf Funding.  To this end, Shane Baldwin and SilverLeaf continued to solicit investment. Notwithstanding the representations made on the SilverLeaf website, it appears that Shane Baldwin's and SilverLeaf's investment strategy is actually to make a 10% deposit on acquisition and then, if it is the winning bid, try to obtain the remaining 90% from investors, losing the deposit if these efforts are unsuccessful.

33.     On July 1, 2010, Shane Baldwin sent an email to Murdock attaching a letter of intent dated June 30, 2010, from American Land Developers stating a purchase price for the Oviedo Asset of $12,000,000.00 as an inducement to Murdock to provide additional money.

34.     On July 2, 2010, SilverLeaf sent Murdock a link to view documents pertaining to the Oviedo Asset and, more specifically, the real estate securing the same.

35.     On July 6, 2010, Matthew Smoot, on behalf of Shane Baldwin, sent an email to Hugo Boren, a representative of Murdock and KAM Financial, purporting to provide an explanation of the Oviedo deal which was being proposed and attaching a proposed operating agreement.  The proposed operating agreement was drafted and/or approved by Heston Nielson.

36.     In his July 6, 2010 email, Mr. Smoot wrote: "Shane Baldwin has asked me to send you the ownership breakdown information for the Oviedo in the Park loan purchase."  By this email, Mr. Smoot identified Mr. Murdock as an investor who would contribute $1.9 Million, an entity known as Heritage Investments, LLC ("Heritage") which would contribute $750,000, an entity known as "Real Source" which would contribute $1 Million and "Smoot Family, L.P." as a contributor of $200,000.

37.     The ownership structure provided that 70% of the profits from the disposition of the Oviedo Asset would be proportionally divided among the members while the development team including Skysource and SilverLeaf, would be entitled to allocation of 30%.

38.     The presence of additional investors was critical to Murdock's assessment of the investment opportunity.

39.     Hugo Boren responded to the July 6, 2010 email on behalf of Murdock, writing: "Should Ken Murdock decide to proceed with this, the entity on his part entering into the agreement would be KAM Financial, LLC…."

40.     During the solicitation of funds from Murdock, and KAM Financial, SilverLeaf and SilverLeaf Funding represented that they were seeking additional funds from parties other

8

than Murdock to assist with the purchase of the M & I Assets and, in fact, funding was secured from other sources.  Neither the efforts in seeking funds from others nor information concerning the eventual funds obtained was provided to Murdock or KAM Financial aside from those investors identified in the July 6, 2010 email from Matthew Smoot to Hugo Boren and described above.

41.     On or about July 8, 2010, a representative of M & I Bank again sent Shane Baldwin and Heston Nielson new amendments to the loan sale agreements which again proposed to extend the time for performance by SilverLeaf Funding and provided for a total purchase price of $14,307,500, including a $1,000,000 penalty, and extended the closing until July 22, 2010.

42.     The Bank Stock Loan Sale Agreement was also amended extending the time for closing until July 22, 2010.

43.     SilverLeaf Funding executed and delivered the proposed amendments to M & I Bank on or about July 8, 2010.

44.     Despite the apparent lack of independent funds, a total of $12,631,144.00 was wired to M & I Bank on July 8, 2010, to fund the purchase of the M & I Assets. By email, M & I Bank confirmed by email to Shane Baldwin and Heston Nielson that it received three wires on that date including one wire in the amount of $6,261,705.82, and two separate wires of $3,184,719.59 each.

45.     None of the funds wired to M & I Bank for the purchase of the M & I Assets on July 8, 2010, were provided by KAM Financial.

46.     On or about July 8, 2010, and in conjunction with the closing of the acquisition by SilverLeaf Funding of the M & I Assets, unbeknownst to Murdock and in contravention to the

9

representations made, SilverLeaf Funding entered into two loan sale agreements by which an entity known as GAHA Fund II, LLC, a California limited liability company ("GAHA"), purchased from SilverLeaf Funding, the M & I Assets including the Oviedo Asset.

47.     At the time of the closing of the sale by SilverLeaf Funding to GAHA, an entity known as Lincolnshire Associates II, Ltd., a Texas limited partnership ("Lincolnshire"), loaned $6,261,705.00 to GAHA.  This loan from Lincolnshire funded the $6,261,705.82 wire to M & I Bank on July 8, 2010.

48.     Entities known as Great American Real Estate, LLC, a California limited liability company ("GARE") and Hacienda at 12625 Bluff Drive, LLC ("Hacienda") each contributed $3,224,388.00 to fund GAHA's purchase of the M & I Assets from SilverLeaf Funding and these funds comprised the two wires of $3,184,719.50 to M & I Bank to fund SilverLeaf Funding's purchase of the M & I Assets.

49.     On July 8, 2010, and in conjunction with the sale of the M & I Assets from SilverLeaf Funding to GAHA, again unbeknownst to Murdock and in contravention to the representations made, SilverLeaf Funding, GAHA, GARE and Hacienda entered into a profit sharing agreement (the "Profit Sharing Agreement") by which the anticipated profits from the liquidation of the M & I Assets were to be distributed. The Profit Sharing Agreement does not contemplate any severance of the M & I Assets or the payment of any profits to KAM Financial or Oviedo.  Neither KAM Financial nor Oviedo are a party to the Profit Sharing Agreement.

50.     On November 5, 2010, SilverLeaf Funding assigned its interest in the Profit Sharing Agreement to SilverLeaf through a document executed on its behalf.

1180695.1

51.     In sum, according to the Profit Sharing Agreement, and even considering the subsequent assignment of interest as of July 8, 2010, SilverLeaf would not be paid anything from the sale of any of the M & I Assets until other parties had been repaid in full a total of over $12 Million, and even after SilverLeaf Funding's investment was repaid, SilverLeaf would be entitled to only 20% of additional profits.

52.     Moreover, as of July 8, 2010, SilverLeaf had relinquished any control it may have had or acquired over the Oviedo Asset and had no ability to transfer that asset to the entity known as Oviedo for which it was soliciting investment by Murdock.

53.     Notwithstanding that SilverLeaf Funding's acquisition of the M & I Assets had been completed as of July 8, 2010, and notwithstanding the fact that SilverLeaf Funding had sold those M & I Assets to GAHA retaining only a right to a small percentage of potential profits realized from the eventual liquidation of those assets, SilverLeaf and Shane Baldwin thereafter continued to solicit investment from Murdock and KAM Financial in Oviedo while concealing the true nature of the transactions which had already occurred.

54.     At no time during the efforts to solicit funds from KAM Financial and Murdock did Baldwin or SilverLeaf disclose to Murdock that the M & I Assets, including the Oviedo Asset, had been sold to GAHA.  Rather, Murdock continued to believe based upon prior and continuing representations, that the Oviedo Asset would be purchased and held in the Oviedo entity and that he would be entitled to a proportionate percentage of the profits derived from disposition of that particular asset.

55.     On July 19, 2010, Shane Baldwin sent Murdock an email with instructions to wire money to M & I  Bank for " for credit to SilverLeaf Financial Commercial Loan Purchase

1180695.1

Account FL 5 BSP." The term "FL 5 BSP" is the term used to define the Oviedo Asset among the various M & I Assets. The account known as "SilverLeaf Financial Commercial Loan Purchase Account FL 5 BSP" was established by and for the benefit of SilverLeaf or its members.

56.     On July 20, 2010, Shane Baldwin forwarded to Ken Murdock an email indicating that the purchaser of a piece of property contiguous to the Oviedo Asset may also be interested in purchasing the Oviedo Asset.

57.     Thereafter, but still on July 20, 2010, Shane Baldwin sent to Murdock an "Operating Agreement of Oviedo in the Park, LLC" (the "Operating Agreement") with an effective date of July 6, 2010, which Murdock signed and returned.

58.     The Operating Agreement provides that the company "was formed for the purpose of purchasing, managing and liquidating the secured loans described on Exhibit A hereto… and if necessary, managing, holding, and liquidating the real property… secured by the Loans." Exhibit A to the Operating Agreement does not identify any loans. Throughout the course of their solicitation of Murdock, however, Shane Baldwin and SilverLeaf had represented that Oviedo would acquire the Oviedo Asset.

59.     The Operating Agreement, dated July 6, 2010, and provided to Murdock on July 20, 2010, reads that "The Company has been formed pursuant to the [Utah Revised Limited Liability Act]."

60.     Various provisions of the Operating Agreement refer to the "Articles." These are defined as "the Articles of Organization of the Company that have been filed with the [Division of Corporations and Commercial Code of the Utah Department of Commerce]."

12

61.     Under the Operating Agreement, Oviedo was organized as a Manager-managed limited liability company. The identified managers are SilverLeaf and Skysource, LLC, a limited liability of which Defendant Smoot is a member and manager. Under Section 8.11 of the Operating Agreement, the Managers are not entitled to compensation for their services.

62.     The powers of the managers are broad, but limited in some crucial respects.  More specifically, Section 8.4 of the Operating Agreement provides, among other things:  "The Manager shall not, without the approval or ratification of a Majority Vote of the Preferred and Common Members…  (i) merge or consolidate with and into another entity…(iii) sell or otherwise dispose of the Loans or the Real Property securing the Loans…."

63.     The Operating Agreement does not contemplate any participation in the business of Oviedo by KAM Financial other than a contribution of capital.

64.     The Operating Agreement sent on July 20, 2011 also contained an exhibit which purported to identify the entity's equity investors and their proportionate interest in the entity. By this document, SilverLeaf and Shane Baldwin represented that Murdock was to be a "preferred member"– through KAM – owning a 51.94% share of Oviedo in exchange for a $2,000,000.00 capital contribution.    SilverLeaf is identified as a preferred member with a 25.97% interest based upon a $1,000,000.00 capital contribution. The remaining 22.08% was to be split between two other preferred members according to their contributions:  Steven & Kathy Smoot (the "Smoots")  and Heritage Equity Investments, LLC ("Heritage").  Profits of Oviedo were to be distributed among the members according to their proportionate contribution evidenced in their separately established capital accounts.  Such documents were fraudulent because the Ovieto Assets were no longer controlled or owned by SilverLeaf.

13

65.     The presence of other investors gave Murdock confidence that the proposed investment was sound and in accordance with the various representations made to him during the course of his solicitation.

66.     Concurrent with the provision of the Operating Agreement to Murdock, Shane Baldwin represented that the Smoots and Heritage had made the investments identified and that SilverLeaf had, itself, contributed $1 Million to the deal. These facts were material in inducing KAM Financial to invest in Oviedo and execute the Operating Agreement to the extent other investors, including Shane Baldwin, himself, showed confidence in the transactions contemplated.

67.     Upon execution and return of the signed Operating Agreement, and in reliance upon all of the foregoing representations of SilverLeaf and Shane Baldwin in correspondence and conversation through July 20, 2010, and those representations contained in the documents provided, including the Operating Agreement and documentation regarding the value and prospective purchase of the Oviedo Asset by a third party, Murdock initiated a wire of $2,000,000.00 from KAM to M & I Bank for "SilverLeaf Financial Commercial Loan Purchase Account FL 5 (BSP)." That is, the funds were earmarked for the purchase of the Oviedo Asset – the transaction which, unbeknownst to KAM Financial, had already closed and the asset which had already been transferred.

68.     After the wire transfer by KAM Financial on July 20, 2010, M & I Bank confirmed to Shane Baldwin that the funds contributed by KAM Financial were in the account for purchase of the Oviedo Asset.

69.     The funds were not utilized for the purchase of the Oviedo Asset or any of the M & I Assets as that sale was apparently consummated on July 8, 2010.  It is unknown for what purpose SilverLeaf or Shane Baldwin utilized the funds contributed by KAM Financial.

70.     KAM Financial has learned since its transfer of funds that no investment was made by the Smoots and Heritage.

71.     Neither SilverLeaf nor Shane Baldwin contributed any independent funds to any transaction associated with Oviedo, the Oviedo Asset or the purchase of the M & I Assets. SilverLeaf did not contribute the $1,000,000 identified in the Operating Agreement as its capital contribution.

72.     Articles of Organization for Oviedo were never filed with the State of Utah and, in fact, the entity did not on July 20, 2010 exist and has not been created at any point since.

73.     No capital account has been established for the membership interest of KAM Financial, or any of the other members and managers identified in the Operating Agreement.  In fact, no entity exists to do so.

74.     KAM Financial transferred the $2,000,000 for purchase of the Oviedo Asset based upon the representations described herein including, but not limited to, those representations concerning the value and nature of the Oviedo Asset, the potential for re-sale of the Oviedo Asset, the establishment of Oviedo as an entity which would hold and liquidate the Oviedo Asset, the structure, ownership, and operation of Oviedo, and the potential returns on investment related to the Oviedo Asset.

75.     The representations concerning the value and nature of the Oviedo Asset, the potential for re-sale of the Oviedo Asset, the establishment of Oviedo as an entity which would

hold and liquidate the Oviedo Asset, the structure, ownership, investment in, and operation of Oviedo, and the potential returns on investment related to the Oviedo Asset made by Shane Baldwin and SilverLeaf were false at the time they were made and such falsity could not have been discovered by KAM Financial through the exercise of reasonable diligence.

76.     In addition, KAM Financial was never informed of the ownership status of the Oviedo Asset after it was transferred to GAHA on or about July 8, 2010 and after SilverLeaf had received assignment of SilverLeaf Funding's entitlement to profits from the sale of the M & I Assets on that same date. This information was material as KAM Financial specifically provided funds for the purchase of the Oviedo Asset and believed it was purchasing an entitlement to profits from the disposition of the same.

77.     In fact, as of July 20, 2010 – the date the Operating Agreement was provided to Murdock and signed on behalf of KAM Financial  and the time of  the $2,000,000 investment in Oviedo by KAM Financial – the Oviedo Asset had already been acquired by another party and could not be possessed or sold by Oviedo.

78.     The acquisition of the Oviedo Asset by GAHA and the projected distribution of all rights to profits from the sale of the same as dictated by the Profit Sharing Agreement, were known to SilverLeaf and Shane Baldwin as of July 20, 2010, but they remained silent in their solicitation of investment from KAM Financial and KAM Financial could not have discovered the true status of the asset even with exercise of reasonable diligence.  These facts were known, or should have been known, to SilverLeaf, Shane Baldwin, Heston Nielson, and Matthew Smoot, at the time the Operating Agreement was drafted and delivered for signature both on July 6, 2010, and July 20, 2010.

16

79.     None of the Defendants informed KAM Financial or Murdock of the details or nature of the transaction with GAHA and the Profit Sharing Agreement at any time before KAM Financial's execution of the Operating Agreement and transmission of $2,000,000.  In fact the Defendants made affirmative misrepresentations to induce Murdock and KAM Financial to transmit the funds.

80.     Even on July 20, 2010, twelve days after the transaction by which GAHA – and not Oviedo or SilverLeaf – acquired the Oviedo Asset, Shane Baldwin forwarded an email to Murdock indicating that a purchaser of property contiguous to that securing the Oviedo Asset would be interested in purchasing the Oviedo Asset.  This information was provided to Murdock to induce his investment based upon an understanding that, as a member of Oviedo, KAM Financial would be entitled to a portion of the proceeds of the suggested sale of the Oviedo Asset.

81.     Shane Baldwin and SilverLeaf continued to provide false representations concerning the prospects for disposition of the Oviedo Asset to Murdock even after his execution of the Operating Agreement and payment of $2,000,000 in an effort to conceal the misappropriation of the funds provided for purchase of the Oviedo Asset.

82.     On August 2, 2010, Shane Baldwin forwarded an offer for purchase of the security for the Oviedo Asset in the amount of $8,000,000 and indicated that a counteroffer would be made.

83.     On August 2, 2010, Shane Baldwin sent Murdock another email attaching a contract for purchase of the security for the Oviedo Asset for the amount of $22,500,000.

1180695.1

84.     On or about October 21, 2010, foreclosure of the real estate securing the Oviedo Asset was completed and a Certificate of Title for the real estate was executed in the name of GAHA Oviedo, LLC.

85.     On or about May 2, 2011, Murdock attended a meeting with Shane Baldwin, among others. At this meeting Shane Baldwin represented that the property securing the Oviedo Asset had been foreclosed on and that SilverLeaf controlled the property.  Such affirmative representation was false.

86.     Thereafter, on June 8, 2011, SilverLeaf informed a representative of KAM Financial, that Oviedo in the Park, LLC – the entity to which KAM Financial believed it was contributing on July 20, 2010, but which had never been formed – and that the investment had been converted to a joint venture named GAHA Oviedo, LLC.  At no time did KAM Financial approve a transfer of its interest from Oviedo to GAHA Oviedo. At no time did KAM Financial execute an operating agreement for GAHA Oviedo nor did KAM Financial have an ownership interest in GAHA.

87.     Each of the misrepresentations made by Defendants was material in that  if Murdock had known the truth about any of the facts identified, he would not have executed the Operating Agreement and would not have paid $2,000,000 on July 20, 2010, for a membership interest in Oviedo.

88.     The Defendants made the misrepresentations identified herein  knowingly and with scienter. Such representations concerning the prospects for profit to KAM Financial upon disposition of the Oviedo Asset were made with the intent to induce payment of $2,000,000 by KAM Financial such that SilverLeaf could benefit from such investment.

89.     KAM Financial reasonably relied upon the material misrepresentations and omission identified herein in that KAM Financial could not have with reasonable diligence discovered that the Oviedo Asset had been sold as of the time of his investment, that other investors as identified had not invested in Oviedo, that SilverLeaf had only a minimal entitlement to profits from the potential liquidation of the Oviedo Asset, and otherwise.

90.     KAM Financial has been injured and continues to be injured and suffer economic loss as a direct result of the material misrepresentation and reckless omissions of the Defendants as identified herein.

91.     KAM Financial would not have been injured in that he would not have transferred $2,000,000 as directed by Defendants on July 20, 2010, but for the material misrepresentations and omissions and, more generally, the device, scheme and artifice, and fraudulent and deceitful transactions practice and course of business of the Defendants.

92.     To date, KAM Financial has not received a return of its initial $2,000,000 investment in Oviedo. Oviedo does not exist. It is presently unknown to what use the original investment was put by SilverLeaf and Shane Baldwin.  It is known, however, that KAM Financial has received nothing in return for this investment.

## CONCLUSIONS OF LAW

### Federal Securities Fraud, 15 U.S.C. § 78j(b)

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b); *see also Adams v. Kinder–*

*Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir.2003). Therefore, to prove a claim of securities

fraud under Rule 10b–5, a plaintiff must establish the following five elements:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Gibson v. Vanisi*, No. 2:03-CV-328-PGC, 2005 WL 165382, at *2 (D. Utah Jan. 25, 2005)

(citing *Adams,* 340 F.3d at 1095; *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th

Cir.1997)).

Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and

ACM SilverLeaf Funding have engaged in conduct sufficient to satisfy each element of this

claim and are thus liable for securities fraud under 15 U.S.C. 78j(b). Accordingly, KAM is

entitled to damages in the amount of $2,000,000.00 – the amount of its transfer of funds in

reliance upon Defendants' representations – plus interest from the date of transfer at the statutory

rate.

**Utah Securities Fraud, Utah Code Ann. § 61-1-1, *et seq*.**

The Utah Uniform Securities Act states that:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>
> (1) employ any device, scheme, or artifice to defraud;
>
> (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Utah Code Ann. § 61–1–1. In addition, the Act provides, "The court in a suit brought under

Subsection (1) may award an amount equal to three times the consideration paid for the security,

together with interest, costs, and attorney fees, less any amounts, all as specified in Subsection

(1) upon a showing that: (a) the violation was reckless or intentional; ….” Utah Code Ann. § 61-

1-22. In this context, to act willfully “means to act deliberately and purposefully, as

distinguished from merely accidentally or inadvertently,” and “when applied to the intent with

which an act is done or omitted, [willful] implies a willingness to commit the act” but “does not

require an intent to violate the law or to injure another or acquire any advantage.” *State v.*

*Chapman*, 2014 UT App 255, ¶ 11, --- P.3d ---- (quoting *State v. Larsen,* 865 P.2d 1355, 1358 n.

3 (Utah 1993)).

     Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and

ACM SilverLeaf Funding have engaged in conduct sufficient to satisfy each element of this

claim and are thus liable for Securities Fraud under Utah Code Ann. § 61-1-1, *et seq.*.

Accordingly, KAM is entitled to damages in the amount of $2,000,000.00 – the amount of its

transfer of funds in reliance upon Defendants’ representations – plus interest from the date of

transfer at the statutory rate. Moreover, because the foregoing findings of fact demonstrate that

Shane Baldwin, SilverLeaf Financial, LLC and ACM SilverLeaf Funding recklessly and/or

intentionally violated Utah Code Ann. § 61-1-1, they are liable for treble damages under Utah

Code Ann. § 61-1-22 in the amount of $6,000,000.00 plus interest from the date of transfer at the

statutory rate.

### **Fraud**

     To prove a claim of fraud under Utah law, a plaintiff must establish “(1)[t]hat a

representation was made; (2) concerning a presently existing material fact; (3)which was false;

(4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had

insufficient knowledge upon which to base such representation; (5) for the purpose of inducing

the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its

falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and

damage." *Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524 (quoting *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 33, 21 P.3d 198).

Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and ACM Silverleaf Funding have engaged in conduct sufficient to satisfy each element of this claim and are thus liable for fraud. Accordingly, KAM is entitled to damages in the amount of $2,000,000.00 – the amount of its transfer of funds in reliance upon Defendants' representations – plus interest from the date of transfer at the statutory rate.

### Negligent Misrepresentation

To prove a claim for negligent misrepresentation under Utah law, a plaintiff must "identify a representor who makes an affirmative assertion which is false." *Smith v. Frandsen*, 2004 UT 55, ¶ 10, 94 P.3d 919 (internal quotations omitted) (quoting *Ellis v. Hale*, 13 Utah 2d 279, 373 P.2d, 382, 385 (1962)). However, as negligent misrepresentations constitute a form of fraud, "an omission may be actionable as negligent misrepresentation where the defendant has a duty to disclose." *Id*. at ¶6 (citing *Atkinson v. IHC Hosps., Inc.*, 798 P.2d 733, 737 (Utah 1990)); *see also Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980).

Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and ACM SilverLeaf Funding have engaged in conduct sufficient to satisfy each element of this claim and are thus liable for negligent misrepresentation. Accordingly, KAM is entitled to damages in the amount of $2,000,000.00 – the amount of its transfer of funds in reliance upon Defendants' representations – plus interest from the date of transfer at the statutory rate.

### Breach of Fiduciary Duty

To prove a claim for breach of fiduciary duty, a plaintiff must establish the existence of a fiduciary duty and the breach of that duty. *See, e.g., Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, P21 (Utah 2004). A duty of loyalty arises from the fiduciary duties of an agent "to act loyally for the principal's benefit in all matters connected with the agency relationship." *Eagar v.*

*Burrows*, 2008 UT 42, P25 (Utah 2008), quoting Restatement (Third) of Agency § 8.01 (2006). This requires an agent to "subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship." *Id*. And although it is most common for courts to address the fiduciary duties of corporate officers and directors, "there is no basis for concluding these are the only types of agents subject to fiduciary duties." *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, P21 (Utah 2004), quoting *Fryetech, Inc. v. Harris*, 46 F. Supp. 2d 1144, 1152 (D. Kan. 1999).

Utah's appellate courts have applied a factors test to determine the existence of a fiduciary relationship.  *See, e.g. First Security Bank of Utah v. Summit County Title*, 786 P.2d at 1333.  The factors, or "principles", include:

- a position of peculiar confidence placed by one individual in another;
- a person with a duty to act primarily for the benefit of another;
- a party in a position to have and exercise and does have and exercise influence over another;
- a condition of superiority of one of the parties over the other;
- the property or interest or authority of the other is placed in the charge or the fiduciary;
- a continuous trust is reposed by one party in the skill and integrity of another;
- certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other.

*Id*. at 1333.  *See also Ong Int'l (USA), Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 454 (Utah 1993) (stating that "a fiduciary duty can exist where one party has decidedly greater access to information than the other.").

Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and ACM SilverLeaf Funding have engaged in conduct sufficient to satisfy each element of this claim and are thus liable for breach of their fiduciary duties to KAM Financial. Accordingly, KAM is entitled to damages in the amount of $2,000,000.00 – the amount of its transfer of funds

in reliance upon Defendants' representations – plus interest from the date of transfer at the statutory rate.

### Breach of Contract

To prove a prima facie case for breach of contract, a plaintiff must establish "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 2001 UT 20 ¶ 14, 20 P.3d 388 (citing *Nuttall v. Bernston*, 83 Utah 535, 543, 30 P.2d 738, 741 (1934)).  Thus, "[o]ne cannot prove a breach of contract claim without proving the actual existence of a contract, including offer and acceptance." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2008 UT App 405, ¶ 17, 197 P.3d 659.  Furthermore, an essential element of a breach of contract claim, damages "seek to place the aggrieved party in the same economic position the party would have been in if the contract was not breached." *Eleopulos v. McFarland and Hullinger, LLC*, 2006 UT 352, ¶ 10, 145 P.3d 1157; *see also Cook Associates, Inc. v. Utah School and Inst. Trust Lands Administration*, 2010 UT App 284, ¶ 35, 243 P.3d 888.

Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and ACM SilverLeaf Funding have engaged in conduct sufficient to satisfy each element of this claim and are thus liable for breach of contract. Accordingly, KAM is entitled to damages in the amount of $2,000,000.00 – the amount of its transfer of funds in reliance upon Defendants' representations – plus interest from the date of transfer at the statutory rate.

### Unjust Enrichment

To prove a claim for unjust enrichment, a plaintiff must establish three elements. "First, there must be a benefit conferred on one person by another. Second, the conferee must appreciate or have knowledge of the benefit. Finally, there must be the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to

retain the benefit without payment of its value." *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580, *holding modified by State v. Levin*, 2006 UT 50, ¶ 13, 144 P.3d 1096 (internal citations and quotations omitted).

Based on the foregoing findings of fact, Shane Baldwin, SilverLeaf Financial, LLC, and ACM SilverLeaf Funding have engaged in conduct sufficient to satisfy each element of this claim and are thus liable for unjust enrichment. Accordingly, KAM is entitled to damages in the amount of $2,000,000.00 – the amount of its transfer of funds in reliance upon Defendants' representations – plus interest from the date of transfer at the statutory rate.

## ORDER

Plaintiff is hereby directed to submit a form of final judgment and an application for an award of attorneys' fees consistent with this Order.

IT IS SO ORDERED
        DATED this 27th day of March, 2015.


                                        BY THE COURT:


                                        _____
                                        United States District Judge

APPROVED AS TO FORM:

PETERSON LAW FIRM


*/s/ Brett M. Peterson*
**Signature affixed with permission granted by email dated December 16, 2014**
Brett M. Peterson
*Attorney for Defendants Silverleaf Financial,*
*ACM Silverleaf Funding, and Shane Baldwin*

1180695.1